1  **DAVID M.C. PETERSON**
   California State Bar No. 254498
2  FEDERAL DEFENDERS OF SAN DIEGO, INC.
   225 Broadway, Suite 900
3  San Diego, California  92101-5008
   Telephone:  (619) 234-8467
4  david_peterson@fd.org

5  Attorneys for Mr. Metzgar

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10                    **(HONORABLE LARRY A. BURNS)**

11  UNITED STATES OF AMERICA,          )    Case No.:  08cr0372-LAB
                                       )
12                 Plaintiff,          )    Date:    March 24, 2008
                                       )    Time:    2:00 p.m.
13  v.                                 )
                                       )
14  GEORGE METZGAR,                    )    **STATEMENT OF FACTS AND POINTS AND**
                                       )    **AUTHORITIES IN SUPPORT OF MOTIONS**
15                 Defendant.          )
                                       )
16  _____

17                              **I.**

18                   **STATEMENT OF FACTS**[1]

19       On February 3, 2008, at approximately 10:42 p.m., Mr. Metzgar arrived at the Calexico East Port

20  of Entry.  Mr. Metzgar was the driver of a 1974 Tioga RV.  At primary inspection, Mr. Metzgar gave a

21  negative customs declaration.  Because the primary inspector believed Mr. Metzgar was nervous, the

22  primary inspector referred Mr. Metzgar and the vehicle to secondary inspection.  At secondary inspection,

23  a canine alerted to the rear seat of the RV.  Inspection of the vehicle revealed nineteen (19) packages under

24  the vehicle's rear seat.  The contents allegedly field tested positive for the presence of marijuana.  Mr.

25  Metzgar was arrested and was taken into custody.

26  _____

27       [1] The facts alleged in these motions are subject to elaboration and/or modification at the time these
    motions are heard.  Mr. Metzgar reserves the right to take a position contrary to the following statement
28  of facts at the motions hearing and at trial.  Because he has not yet received any discovery, the statement
    of facts, and the quotations, are taken from the complaint's statement of facts signed by the Magistrate
    Court.

1    On February 14, 2007, the January 2007 Grand Jury panel issued an indictment charging

2    Mr. Metzgar with violating 21 U.S.C. §§ 952 and 960, importation of marijuana, and 21 U.S.C. § 841(a)(1),

3    possession of marijuana with the intent to distribute.  He pled not guilty to these charges.

4    **II.**

5    **THE COURT SHOULD DISMISS THE INDICTMENT BECAUSE 21 U.S.C. §§ 841 AND 960**
     **ARE FACIALLY UNCONSTITUTIONAL; ALTERNATIVELY, THE COURT SHOULD**

6    **REQUIRE THE GOVERNMENT TO PROVE THAT MR. METZGAR KNEW THE**
     **QUANTITY AND TYPE OF CONTROLLED SUBSTANCE THAT HE ALLEGEDLY**

7    **POSSESSED**

8    As the Court is fully aware of the issues in this context, Mr. Metzgar will be brief (but will submit

9    further briefing if the Court would like).  First, the indictment should be dismissed because sections 841 and

10   960 of Title 21 are facially unconstitutional as they require a judge, rather than a jury, to determine the

11   weight and quantity of drug involved, which in turn determines the maximum (and minimum mandatory)

12   sentence.  Second, if the Court disagrees with this, the government must establish *mens rea* (*i.e.*, knowledge)

13   with respect to drug type and quantity.  Given this, the indictment must be dismissed because the

14   government likely failed to instruct the grand jury accordingly.  Mr. Metzgar requests that the Court compel

15   production of the grand jury transcripts, pursuant to Rule 6(e)(3)(E)(ii), with respect to this motion.

16   **III.**

17   **THE INDICTMENT SHOULD BE DISMISSED BECAUSE THIS COURT'S**
     **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**

18   **AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
     **AMENDMENT BY DEPRIVING MR. METZGAR OF THE TRADITIONAL FUNCTIONING**

19   **OF THE GRAND JURY**

20   **A.    Introduction.**

21   The indictment in the instant case was returned by the January 2007 grand jury.  See Clerk's Record

22   at 6.  That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge

23   on January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007 (Exhibit

24   A hereto).  This Court's instructions to the impaneled grand jury deviate from the instructions at issue in the

25   major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

26   several //

27   //

28   //

1  ways.[2]  These instructions compounded this Court's erroneous instructions and comments to prospective

2  grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex.

3  A.  See Reporter's Transcript of Proceedings, dated January 11, 2007 (Exhibit B hereto).

4      **1.    This Court Instructed Grand Jurors That Their Singular Duty Is to
           Determine Whether or Not Probable Cause Exists and That They Have
5          No Right to Decline to Indict When the Probable Cause Standard Is
           Satisfied.**

6

7  After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

8  responsibility, see Ex. A at 3, 3-4, 5,[3] this Court instructed the grand jurors that they were forbidden "from

9  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

10  federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See

11  id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with

12  that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting

13  even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence

14  may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

15  because the grand jurors disagree with a proposed prosecution.

16  Immediately before limiting the grand jurors' powers in the way just described, this Court referred

17  to an instance in the grand juror selection process in which it excused three potential jurors.  See id. at 8.

18      I've gone over this with a couple of people.  You understood from the questions and answers
        that a couple of people were excused, I think three in this case, because they could not
19      adhere to the principle that I'm about to tell you.

20  Id.  That "principle" was this Court's discussion of the grand jurors' inability to give effect to their

21  disagreement with Congress.  See id. at 8-9.  Thus, this Court not only instructed the grand jurors on its view

22  of their discretion; it enforced that view on pain of being excused from service as a grand juror.

23  //

24

25      [2]  See e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-
26  Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II);
    United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v.
27  Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

28      [3]  See also id. at 20 ("You're all about probable cause.").

1    Examination of the recently disclosed voir dire transcript, which contains additional instructions and

2    commentary in the form of the give and take between this Court and various prospective grand jurors,

3    reveals how this Court's emphasis of the singular duty is to determine whether or not probable cause exists

4    and its statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress

5    merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of

6    its earliest substantive remarks, this Court makes clear that the grand jury's sole function is probable cause

7    determination.

8    [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
     crime was committed?  And second, do we have a reasonable belief that the person that they
9    propose that we indict committed the crime?"

10   If the answer is "yes" to both of those, then the case should move forward.  If the answer to
     either of the questions is "no," then the grand jury should not hesitate and not indict.
11

12   See Ex. B at 8.  In this passage, this Court twice uses the term "should" in a context makes clear that the

13   term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

14   addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

15   committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

16   crime."

17   Equally revealing are this Court's interactions with two potential grand jurors who indicated that,

18   in some unknown set of circumstances, they might decline to indict even where there was probable cause.

19   Because of the redactions of the grand jurors' names, Mr. Metzgar will refer to them by occupation.  One

20   is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).

21   The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were

22   not an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified

23   immigration cases.  See id.

24   This Court made no effort to determine what sorts of drug and immigration cases troubled the CSW.

25   It never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district,

26   such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.  Rather,

27   it provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply

28   not capable of expression in the context of grand jury service.

1  //

2       Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the
3  defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair
   appraisal of the evidence of the case that's in front of you, so, too, is the United States
4  entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I
   wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our
5  government is doing.  I disagree with these laws, so I'm not going to vote for it to go
   forward."  If that is your frame of mind, the probably you shouldn't serve.  Only you can tell
6  me that.

7  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, this Court let the grand

8  juror know that it would not want him or her to decline to indict in an individual case where the grand juror

9  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See Id.

10  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

11  manifest by this Court's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

12  charge even if [the CSW] thought the evidence warranted it."  See id.  Again, this Court's question provided

13  no context; this Court inquired regarding "a case," a term presumably just as applicable to possession of a

14  small amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand

15  juror listening to this exchange could only conclude that there was *no* case in which this Court would permit

16  them to vote "no bill" in the face of a showing probable cause.

17      Just in case there may have been a grand juror that did not understand his or her inability to exercise

18  anything like prosecutorial discretion, this Court drove the point home in its exchange with REA.  REA first

19  advised this Court of a concern regarding the "disparity between state and federal law" regarding "medical

20  marijuana."  See id. at 24.  This Court first sought to address REA's concerns about medical marijuana by

21  stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into

22  account.

23       Well, those things -- the consequences of your determination shouldn't concern you in the
   sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
24  cannot consider the punishment or the consequence that Congress has set for these things.
   We'd ask you to also abide by that.  We want you to make a business-like decision of
25  whether there was a probable cause. . . .

26  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, this Court went

27  on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

28  //

1  //

2

3      In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

4  That disclosure prompted this Court to begin a discussion that ultimately led to an instruction that a grand

5  juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

14  Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if

15  both questions are answered in the affirmative, lead to an "obligation" to indict.

16      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

17  paradigm, this Court then set about to ensure that there was no chance of a deviation from the obligation

18  to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

23  Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

24  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as

25  it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote

26  to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, this

27  Court made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA

28

1    to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to

2    indict

3    //

4    //

5    because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[4]

6    See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great

7    a risk to run.

8      **2.  The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

9

10     In addition to its instructions on the authority to choose not to indict, this Court also assured the

11   grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See

12   Ex. A at 20.[5]

13

14     [4] This point is underscored by this Court's explanation to the Grand Jury that a magistrate judge will

15   have determined the existence of probable cause "in most circumstances" before it has been presented

16   with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in

     each case because had a magistrate judge not so found, the case likely would not have been presented

17   to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to

     the magistrate court "in most circumstances."  See id.  This instruction made the grand jury more inclined

18   to indict irrespective of the evidence presented.

19     [5] These instructions were provided in the midst of several comments that praised the United States

20   attorney's office and prosecutors in general.  This Court advised the grand jurors that they "can expect

     that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll

21   act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir

     dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S.

22   Attorney, whatever cases they might bring," see Ex. B at 38, this Court affirmatively endorsed the

     prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly,

23   I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You

     were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically,

24   that they're not about the business of trying to indict innocent people or people that they believe to be

     innocent or the evidence doesn't substantiate the charges against.").

25     This Court's discussion of once having been a prosecutor before the Grand Jury compounded the

26   error inherent in praising the government attorneys.  See Ex. A at 9-10.  This Court's instructions implied

     that as a prior prosecutor and current "jury liaison judge," see id. at 8, it would not allow the government

27   attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

       In addition, while this Court instructed the Grand Jury that it had the power to question witnesses,

28   This Court's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if

1   Now, again, this emphasizes the difference between the function of the grand jury and the
    trial jury. You're all about probable cause. If you think that there's evidence out there that
2   might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
    you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*
3   *duty-bound to present evidence that cuts against what they may be asking you to do if they're*
    *aware of that evidence.*

4

5   Id. (emphasis added).

6       The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

7   "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, this Court

8   gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

9   adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id.

10  Thus, this Court unequivocally advised the grand jurors that the government would present any evidence

11  that was "adverse" or "that cuts against the charge." See id.

12  **B.    *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of**
        **the Grand Jury, Which This Court Far Exceeded in Its Instructions as a Whole During**
13      **Impanelment.**

14      The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

15  grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

16  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

17  approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

18  the defendants in those cases. The district court's instructions cannot be reconciled with the role of the

19  grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the

20  January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the

21

22  there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12.
    As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an]
23  instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The
    judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts
24  regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23
    ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from
25  examining jurors to verify whether they understood the instruction as given and then followed it.").

26      [6]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority
27  because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an
    inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional
28  independence.").

1  direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and

2  utterly unable to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers

3  envisioned.  See United States v. Williams, 504 U.S. 36, 49 (1992).

4  //

5          For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

6  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

7  deciding whether a particular prosecution shall be instituted or followed up, performs much the same

8  function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

9  510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

10  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

11  prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

12  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id.,

13  but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

14  by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional

15  Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict

16  was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

17  insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

18  Procedure § 15.2(g) (2d ed. 1999)).

19          Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

20  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

21          The grand jury thus determines not only whether probable cause exists, but also whether to
          "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
22          most significant of all, a capital offense or a non-capital offense -- all on the basis of the
          same facts.  And, significantly, the grand jury may refuse to return an indictment even
23          "'where a conviction can be obtained.'"

24  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

25  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

26  "controls not only the initial decision to indict, but also significant questions such as how many counts to

27  charge and whether to charge a greater or lesser offense, including the important decision whether to charge

28  a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-

1   Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the

2   power to refuse to indict someone even when the prosecutor has established probable cause that this

3   individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367

4   F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002)

5   (per curiam) (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong

6   support in the Ninth Circuit. But not in this Court's instructions.

7   **C.    This Court's Instructions Forbid the Exercise of Grand Jury Discretion Established in
        Both *Vasquez* and *Navarro-Vargas II*.**

8

9          The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

10  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

11  decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

12  every finding of probable cause because the term "should" may mean "what is probable or expected." 299

13  F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge

14  Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

15  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

16  obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See

17  also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

18  Diction and Language Guide 1579 (1999) (brackets in original)).

19         The debate about what the word "should" means is irrelevant here; the instructions here make no

20  such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not

21  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

22  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

23  indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction

24  flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No

25  grand juror would read this language as instructing, or even allowing, him or her to assess "the need to

26  indict." Vasquez, 474 U.S. at 264.

27         While this Court used the word "should" instead of "shall" during voir dire with respect to whether

28  an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that it could only

mean "should" in the obligatory sense.  For example, when addressing a prospective juror, this Court not only told the jurors that they "should" indict if there is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context, it would strain credulity to suggest that this Court was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205. Clearly it was not.

The full passage cited above effectively eliminates any possibility that this Court intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict.  This Court could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if this Court said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then it would have to have intended two different meanings of the word "should" in the space of two consecutive sentences.  That could not have been its intent.  But even if it were, no grand jury could ever have had that understanding.[7]  Jurors are not

---

[7] This argument does not turn on Mr. Metzgar's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by this Court in its unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

08cr0372-LAB

1  presumed to be capable of sorting through internally contradictory instructions. <u>See generally</u> <u>United States</u>

2  <u>v. Lewis</u>, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

3  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

4  //

5      Lest there be any room for ambiguity, on no less than four occasions, this Court made it explicitly

6  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

7      **(1)**    The first occasion occurred in the following exchange when this Court conducted voir dire

8  and excused a potential juror (CSW):

9      The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
       you to say, "Well, yeah, there's probable cause.  But I still don't like what the government
10     is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's
       your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
11     Prospective Juror: Well, I think I may fall in that category.
       The Court: In the latter category?
12     Prospective Juror: Yes.
       The Court: Where it would be difficult for you to support a charge even if you thought the
13     evidence warranted it?
       Prospective Juror: Yes.
14     The Court: I'm going to excuse you then.

15  <u>See</u> Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

16  juror.  Even if the prospective juror did not like what the government was doing in a particular case, that

17  case "should go forward" and this Court expressly disapproved of any vote that might prevent that.  <u>See</u> <u>id.</u>

18  ("I wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent

19  judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary

20  deterrence as to the exercise of discretion by any other prospective grand juror.

21      **(2)**    In an even more explicit example of what "should" meant, this Court makes clear that it there

22  is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

23     The Court: . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

24     You'd have a similar *obligation* as a grand juror even though you might have to grit your
       teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against,
25     for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against
       criminalizing some drugs.
26
       That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and
27     say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a
       crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."  *And*
28

*then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that this Court's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But this Court did not pursue the question of what factual scenarios troubled the prospective jurors, because its message is that there is no discretion not to indict.

**(3)** As if the preceding examples were not enough, this Court continued to pound the point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

**(4)** And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, this Court reiterated that "should" means "shall" when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, this Court advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
The Court: In what regard?

> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two reasons.  First, this Court did not use the term "should" in the passage quoted above.  Second, that context, as well as its consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized consideration of penalty information.  See 474 U.S. at 263.

Noting can mask the undeniable fact that this Court explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to

1    indict." See id. at 264.  This Court's grand jury is not Vasquez's grand jury.  The instructions therefore

2    represent structural constitutional error "that interferes with the grand jury's independence and the integrity

3    of the grand jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The

4    indictment must therefore be dismissed.  Id.

5         The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

6    instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

7    independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

8    decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

9    have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

10   independent."  Id. at 1202 (emphases in the original).

11        Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

12   'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

13   of many of its decisions -- sufficiently protects that power."  See id. at 1214 (Hawkins, J., dissenting).  The

14   flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

15   making a probable cause determination ... unconstitutionally undermines the very structural protections that

16   the majority believes save[] the instruction."  Id.  After all, it is an "'almost invariable assumption of the law

17   that jurors follow their instructions.'"  Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

18   "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

19   in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors

20   erroneous instructions because nothing will happen if they disobey them."  Id.

21        In setting forth Judge Hawkins' views, Mr. Metzgar understands that this Court may not adopt them

22   solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

23   Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

24        Here, again, the question is not an obscure interpretation of the word "should", especially in light

25   of the instructions and commentary by this Court during voir dire discussed above - unaccounted for by the

26   Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on

27   the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,

28   and both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

1    This Court did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly states

2    they enjoy.  It also excused prospective grand jurors who might have exercised that Fifth Amendment

3    prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  <u>See</u>

4    Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

5    embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

6    conscience of the community.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

7    grand jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches

8    of government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

9    1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

10    their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

11    here, this Court has both fashioned its own rules and enforced them.

12    **D.    The Instructions Conflict with *Williams*' Holding That There Is No Duty to Present**
      **Exculpatory Evidence to the Grand Jury.**

13

14    In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

15    argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

16    exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

17    common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

18    judicial authority exists." <u>See</u> <u>id.</u> at 47.  Indeed, although the supervisory power may provide the authority

19    "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

20    amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

21    Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it

22    does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u>

23    at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

24    initiative, rules of grand jury procedure." <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

25    claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See</u> <u>id.</u> at 51-55.

26    Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

27    present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

28

Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that this Court had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, this Court informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that.*" See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.
(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.
(3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## IV.

## **MOTION TO PRESERVE AND INSPECT EVIDENCE**

Mr. Metzgar requests the preservation of all physical evidence in this case. This includes any evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government (or its private contractors) in this case. See United States v. Riley, 189 F.3d 802, 806-808 (9th Cir.1999). This request includes, but is not limited to: (1) the alleged contraband involved in the case, including **all samples used to conduct all tests**; (2) the containers or packaging within which the contraband was discovered; (3) the results of any fingerprint analysis; (4) the defendant's personal effects; (5) any videotapes/audiotapes capturing Mr. Metzgar in this matter; (6) recorded communications made by the government related to the above captioned case, e.g., radio communications post port inspection and pre-stop; (7) any evidence seized from the defendant or any third party; (8) the rough notes of the agents involved in the above captioned case; and (9) the vehicle driven by Mr. Metzgar. Mr. Metzgar requests that government counsel be ordered to notify the agencies and private contractors with custody of such evidence be informed of the Court's preservation order.

1  Further, Mr. Metzgar requests an order granting defense counsel and/or their investigators access

2  to the alleged contraband and other evidence for the purposes of investigation, including inspection,

3  photographing, and re-weighing of the alleged contraband if necessary. Fed. R. Crim. P. 16(a)(1)(C). A

4  proposed Order will be provided for the convenience of the Court.

5  Mr. Metzgar requests that the alleged contraband be preserved until inspection and weighing by the

6  defense is complete and that the remainder of the evidence in the case be preserved throughout the pendency

7  of the case, including any appeals.

8  //

9  //

10

11  **V.**

12  **MOTION TO COMPEL DISCOVERY**

13  Mr. Metzgar moves for the production of the following discovery. This request is not limited to

14  those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody,

15  control, care, or knowledge of any "closely related investigative [or other] agencies." See United States v.

16  Bryan, 868 F.2d 1032 (9th Cir.), cert. denied, 493 U.S. 858 (1989).

17  (1) The Defendant's Statements. The Government must disclose to the defendant all copies of any

18  written or recorded statements made by the defendant; the substance of any statements made by the

19  defendant which the Government intends to offer in evidence at trial; any response by the defendant to

20  interrogation; the substance of any oral statements which the Government intends to introduce at trial and

21  any written summaries of the defendant's oral statements contained in the handwritten notes of the

22  Government agent; any response to any Miranda v. Arizona, 384 U.S. 436, 444 (1966), warnings which may

23  have been given to the defendant; as well as any other statements by the defendant. Fed. R. Crim. P.

24  16(a)(1)(A)-(B). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the

25  Government must reveal all the defendant's statements, whether oral or written, regardless of whether the

26  government intends to make any use of those statements.

27  (2) Arrest Reports, Notes and Dispatch Tapes. The defendant also specifically requests the

28  Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate

to the circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant. See Fed. R. Crim. P. 16(a)(1)(B), Fed. R. Crim. P. 26.2.

(3) Brady Material. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the Government's case. Under Brady v. Maryland, 373 U.S. 83 (1963), impeachment as well as exculpatory //
evidence falls within the definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

(4) Any Information That May Result in a Lower Sentence Under The Guidelines. The Government must produce this information under Brady v. Maryland, 373 U.S. 83 (1963). This request includes any cooperation or attempted cooperation by the defendant as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines. The defendant also requests any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, and information relevant to any other application of the Guidelines.

(5) The Defendant's Prior Record. The defendant requests disclosure of his prior record. Fed. R. Crim. P. 16(a)(1)(D).

(6) Any Proposed 404(b) Evidence. The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609. In addition, under Rule 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. The defendant requests that such notice be given three (3) weeks before trial in order to give the defense time to adequately investigate and prepare for trial.

(7) Evidence Seized. The defendant requests production of evidence seized as a result of any search, either warrantless or with a warrant. Fed. R. Crim. P. 16(a)(1)(E).

(8) <u>Tangible Objects</u>.  The defendant requests the opportunity to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for use in the Government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim. P. 16(a)(1)(E).

(9) <u>Evidence of Bias or Motive to Lie</u>.  The defendant requests any evidence that any prospective Government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his her testimony.

//

//

(10) <u>Impeachment Evidence</u>.  The defendant requests any evidence that any prospective Government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to the defendant.  <u>See</u> Fed R. Evid. 608, 609 and 613; <u>Brady v. Maryland</u>.

(11) <u>Evidence of Criminal Investigation of Any Government Witness</u>.  The defendant requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

(12) <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>.  The defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.

(13) <u>Witness Addresses</u>.  The defendant requests the name and last known address of each prospective Government witness.  The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will <u>not</u> be called as a Government witness.

(14) <u>Name of Witnesses Favorable to the Defendant</u>.  The defendant requests the name of any witness who made an arguably favorable statement concerning the defendant or who could not identify him

1  who was unsure of his identity, or participation in the crime charged.  <u>Brady v. Maryland</u>, 373 U.S. 83

2  (1963).

3      (15)  <u>Statements Relevant to the Defense</u>.  The defendant requests disclosure of any statement

4  relevant to any possible defense or contention that he might assert.

5      (16)  <u>Jencks Act Material</u>.  The defendant requests production in advance of trial of all material,

6  including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500.

7  Advance production will avoid the possibility of delay at the request of defendant to investigate the Jencks

8  material.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness'

9  interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1).  <u>Campbell v.</u>

10  <u>United States</u>, 373 U.S. 487, 490-92 (1963).  In <u>United States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) the

11  //

12  Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes

13  are then subject to the Jencks Act.

14      (17)  <u>Giglio Information</u>.  Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant

15  requests all statements and/or promises, express or implied, made to any Government witnesses, in exchange

16  for their testimony in this case, and all other information which could arguably be used for the impeachment

17  of any Government witnesses.

18      (18)  <u>Agreements Between the Government and Witnesses</u>.  The defendant requests discovery

19  regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future

20  compensation, or any other kind of agreement or understanding, including any implicit understanding

21  relating to criminal or civil income tax, forfeiture or fine liability, between any prospective Government

22  witness and the Government (federal, state and/or local).  This request also includes any discussion with a

23  potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain,

24  even if no bargain was made, or the advice not followed.

25      (19)  <u>Informants and Cooperating Witnesses</u>.  The defendant requests disclosure of the names and

26  addresses of all informants or cooperating witnesses used or to be used in this case, and in particular,

27  disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime

28  charged against Mr. Metzgar.  The Government must disclose the informant's identity and location, as well

as disclose the existence of any other percipient witness unknown or unknowable to the defense. <u>Roviaro v. United States</u>, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

(20) <u>Bias by Informants or Cooperating Witnesses</u>. The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness. <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

(21) <u>Government Examination of Law Enforcement Personnel Files</u>. Mr. Metzgar requests that the Government examine the personnel files and any other files within its custody, care or control, or which could be obtained by the government, for all testifying witnesses, including testifying officers. Mr. Metzgar requests that these files be reviewed by the Government attorney for evidence of perjurious conduct or other like dishonesty, or any other material relevant to impeachment, or any information that is exculpatory, pursuant to its duty under <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).

(22) <u>Expert Summaries</u>. Defendant requests written summaries of all expert testimony that the government intends to present under Federal Rules of Evidence 702, 703 or 705 during its case in chief, written summaries of the bases for each expert's opinion, and written summaries of the experts' qualifications. Fed. R. Crim. P. 16(a)(1)(G). This request includes, but is not limited to, drug/chemical and fingerprint expert testimony.

(23) <u>Residual Request</u>. Mr. Metzgar intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. This request specifically includes all subsections of Rule 16. Mr. Metzgar requests that the Government provide him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

## VI.

## <u>MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS</u>

Defense counsel requests leave to file further motions and notices of defense based upon information gained in the discovery process. To date, counsel has received ZERO PAGES of discovery from the

1  government in this matter.§ Defense counsel intends to file, at the least, motions to suppress any statements

2  by Mr. Metzgar as well as a motion to suppress evidence taken in violation of the Fourth Amendment given

3  the vehicle stop leading to arrest in this case.

4  //

5  //

6  //

7  //

8  //

9  //

10

11                                              **VII.**

12                                        **CONCLUSION**

13         For these and all the foregoing reasons, the defendant, Mr. Metzgar, respectfully requests that this

14  Court grant his motions and grant any and all other relief deemed proper and fair.

15                                        Respectfully submitted,

16

17                                         */s/ David M.C. Peterson*
    DATED: February 15, 2008              DAVID M.C. PETERSON
18                                         Federal Defenders of San Diego, Inc.
                                           Attorneys for Mr. Metzgar
19                                         E-mail: david_peterson@fd.org

20

21

22

23

24

25

26  _____

27         § Defense counsel, however, forwarded a written request for discovery to the government in a letter
    dated February 8, 2008.
28

                                        24                        08cr0372-LAB

INDEX OF EXHIBITS

Exhibit A        Grand Jury Transcript, Partial, January 11, 2007

Exhibit B        Grand Jury Transcript, January 11, 2007

1

2

## CERTIFICATE OF SERVICE

3

     Counsel for Defendant certifies that the foregoing is true and accurate to the best information and

4

belief, and that a copy of the foregoing document has been caused to be delivered this day upon:

5

     Courtesy Copy to Chambers

6

     Copy to Assistant U.S. Attorney via ECF NEF

7

     Copy to Defendant

8

Dated:  February 19, 2008          /s/ DAVID M. PETERSON

9

Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900

10

San Diego, CA  92101-5030
(619) 234-8467  (tel)

11

(619) 687-2666  (fax)
David_Peterson@fd.org (email)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28